[Cite as *State v. Rogers*, 2019-Ohio-1761.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

RICKI DAVID ROGERS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 BE 0048**

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 17 CR 113

**BEFORE:**
Gene Donofrio, Carol Ann Robb, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed

---

*Atty. Daniel P. Fry*, Prosecuting Attorney, 147-A West Main Street, St. Clairsville, Ohio 43950, (No Brief Filed), for Plaintiff-Appellee, and

*Atty. Timothy Young*, Ohio Public Defender and *Atty. Allen Vender,* Assistant Public Defender, The Midland Building, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for Defendant-Appellant.

Dated:
May 1, 2019

**Donofrio, J.**

{¶1} Defendant-appellant, Ricki Rogers, appeals from a Belmont County Common Pleas Court judgment convicting him of illegal conveyance of prohibited items onto grounds of a detention facility following a jury trial.

{¶2} In November and December 2015, appellant was incarcerated at the Belmont Correctional Institution. On December 2, 2015, a letter postmarked November 25 and addressed to appellant arrived at the prison. The letter contained Suboxone.[1] The Suboxone was in the form of paper-thin strips similar to breath-freshening strips. On December 11, 2015, a letter postmarked December 2 and addressed to appellant's bunkmate, Laron East, arrived at the prison. This letter also contained Suboxone. Prison employees intercepted the letters. Consequently, neither the letters nor the Suboxone ever reached appellant or East.

{¶3} Both letters were written on brightly-colored paper and contained similar love poems. Additionally, both letters had hidden pockets cut into the paper. The pockets contained the Suboxone strips. The pockets containing the Suboxone were visible to prison mail screeners when they held the letters up to a light.

{¶4} Additionally, recordings of telephone calls placed using appellant's inmate and PIN numbers and East's inmate and PIN numbers to a woman registered on appellant's visitor's list indicated that the caller may have been soliciting the woman to send the Suboxone to appellant in the prison.

{¶5} A Belmont County Grand Jury indicted appellant on two counts of illegal conveyance of prohibited items onto grounds of a specified governmental facility, third-degree felonies in violation of R.C. 2921.36(A)(2).

{¶6} The matter proceeded to a jury trial. The jury found appellant guilty of both counts. The trial court subsequently sentenced appellant to 36 months in prison on each count to be served consecutively, for a total of 72 months in prison.

---

1 Suboxone is a prescription drug containing the active ingredients buprenorphine and naloxone. It is used to treat people who are addicted to opioids.

{¶7}   Appellant filed a timely notice of appeal on November 27, 2017.  He now raises a single assignment of error.

{¶8}   Appellant's sole assignment of error states:

THE TRIAL COURT VIOLATED RICKI ROGERS'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN, IN THE ABSENCE OF SUFFICIENT EVIDENCE, IT ENTERED A JUDGMENT OF CONVICTION FOR ILLEGAL CONVEYANCE OF WEAPONS, DRUGS, OR OTHER PROHIBITED ITEMS ONTO GROUNDS OF A DETENTION FACILITY.

{¶9}   Appellant argues there was insufficient evidence to support his conviction. He notes that the jury was not instructed on complicity.  So the only way he could be convicted was as a principal offender.  Appellant points out the evidence was that he was never in possession of the drugs.  He argues a person cannot convey something that he does not possess.  Appellant contends that the state's theory of the case was that he solicited someone to mail the drugs to him.  But he argues this is only evidence of complicity, on which the jury was not instructed.  He claims there was no evidence that he was the principal offender.

{¶10}   Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict.  *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy.  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  Whether the evidence is legally sufficient to sustain a verdict is a question of law.  *Id.*  In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Smith*, 80 Ohio St.3d at 113.

{¶11}   The jury convicted appellant of two counts of illegal conveyance of prohibited items onto the grounds of a detention facility in violation of R.C. 2921.36(A)(2). That statute provides that "[n]o person shall knowingly convey, or attempt to convey, onto the grounds of a detention facility * * * [a]ny drug of abuse, as defined in section 3719.011 of the Revised Code[.]"  R.C. 2921.36(A)(2).  A "drug of abuse" is any controlled

substance as defined in R.C. 3719.01, any harmful intoxicant as defined in R.C. 2925.01, and any dangerous drug as defined in R.C. 4729.01. R.C. 3719.011(A). A "dangerous drug" includes those only available by prescription. R.C. 4729.01(F)(1).

{¶12} We must examine the state's evidence to determine whether there was sufficient evidence to support appellant's conviction.

{¶13} Cynthia Dobrzynski is a mail screener at the Belmont Correctional Institution where appellant was housed. She testified that screeners at the prison search every piece of incoming mail for contraband. (Tr. 153-154). Dobrzynski stated that Suboxone is a major problem at the prison noting that inmates sell the Suboxone strips for $50 to $100 inside the prison. (Tr. 154).

{¶14} Dobrzynski testified that on December 2, 2015, she screened an envelope addressed to appellant. (Tr. 158; State Ex. 12). The letter was postmarked November 25, 2015. (Tr. 166). The return address was 2410 Nebraska, Toledo, Ohio. (Tr. 168). She stated that the envelope contained a four-page letter written on bright blue and fluorescent pink paper. (Tr. 160-161; State Ex. 11). Dobrzynski stated that when she held up the third and fourth pages of the letter to a light, she noticed something was concealed in the paper. (Tr. 161-162). Once she noticed that something was concealed in the paper, Dobrzynski contacted her investigator. (Tr. 163). She stated that the letter was never given to appellant. (Tr. 166).

{¶15} Brian Driscoll was also a mail screener at Belmont Correctional Institution at the time. Driscoll testified that on December 11, 2015, he screened an envelope addressed to Laron East, appellant's bunkmate. (Tr. 171; State Ex. 1). The return address was 941 ½ North Superior, Toledo, Ohio. (Tr. 174). Driscoll stated that the envelope contained a four-page letter written on blue, pink, and yellow paper. (Tr. 175; State Ex. 2). He testified that when he held the blue and the pink papers up to the light, he noticed small strips inside the paper. (Tr. 176, 178). Driscoll then contacted his investigator. (Tr. 179).

{¶16} Paul Bumgardner is the investigator at Belmont Correctional Institution. He testified regarding the prison phone system. Bumgardner stated that each inmate has a unique six-digit inmate number along with a PIN number. (Tr. 184). In order for an inmate to make a phone call, he must enter both his inmate number and PIN number.

(Tr. 184). Additionally, each inmate has certain telephone numbers assigned into his phone log so that he can only call certain people. (Tr. 184). Bumgardner testified that inmates sometimes use other inmates' numbers to place calls so that the call is not traced back to them. (Tr. 185-186).

**{¶17}** Bumgardner further testified that each prisoner has a visiting log. (Tr. 196). All visitors to the prison must fill out an application to visit, which includes their name, social security number, and phone number. (Tr. 197).

**{¶18}** Bumgardner also testified about the letters Dobrzynski and Driscoll alerted him to. He stated that he collected those letters and turned them over to the state highway patrol for testing. (Tr. 188-189, 191).

**{¶19}** Bumgardner further testified that appellant and East were "bunkies," meaning they shared a bunk bed in their cell. (Tr. 192). Once Bumgardner saw the letters to appellant and East, he looked through the phone records and visiting logs to see if they might be calling or getting visits from a person in common. (Tr. 199). Bumgardner found that both men had placed calls to Misty Wetzel. (Tr. 199). He noted that Wetzel was listed as a friend on appellant's visiting log. (Tr. 200). He also noted that Wetzel listed her address as 2410 Nebraska, Lot 28, Toledo, Ohio. (Tr. 203; State Ex. 14).

**{¶20}** Finally, Bumgardner testified that when inmates are talking about drugs, or specifically talking about Suboxone, over the phone they usually give the drugs a code name. (Tr. 208). He stated that inmates sometimes refer to drugs as money, food boxes, oranges, or bands. (Tr. 207-209).

**{¶21}** Ohio State Highway Patrol Trooper Trenas Weaver investigates crimes committed on state-owned property, including the Belmont Correctional Institution. Trooper Weaver testified that he removed seven Suboxone strips from man-made pockets in the blue and pink papers from the letter addressed to appellant. (Tr. 234-239). He testified that the strips tested positive for buprenorphine (the active ingredient in Suboxone), a Schedule III substance. (Tr. 239). Trooper Weaver further testified that he removed six Suboxone strips from the man-made pockets in the blue and pink papers from the letter addressed to East. (Tr. 247-250). Trooper Weaver stated the letter to East was sent "in the same way" as the letter that was sent to appellant, meaning that it was on bright-colored paper with a man-made pocket in it. (Tr. 240-241). He also stated

that the writing style of the two letters was the same, noting that both letters contained short "relationship-type" poems. (Tr. 242, 276).

**{¶22}** Trooper Weaver also testified about numerous phone calls made to Wetzel from the prison. He testified that multiple phone calls were made to Wetzel using appellant's inmate and PIN numbers between November 26 and November 30, 2015. (Tr. 288). Weaver also testified that phone calls were made to Wetzel using East's inmate and PIN numbers on December 3 and December 10, 2015. (Tr. 289-290, 293). But based on conversations the trooper had with East and knowing what East's voice sounded like, Trooper Weaver opined that it was not East who called Wetzel on December 3 or 10. (Tr. 292-293, 294). The trooper testified that a call was also placed to Wetzel on December 16, 2015, using East's inmate and PIN numbers. (Tr. 294). After listening to the call, Trooper Weaver opined that it was in fact East this time calling Wetzel. (Tr. 294). The trooper also noted that on December 15, 2015, appellant went into segregation in prison. (Tr. 295).

**{¶23}** Trooper Weaver testified as to some of the specifics in one of the calls made to Wetzel. In the call, the caller tells Wetzel to send a "food box" "to the east side." (Tr. 298). Trooper Weaver testified he believed this was meant to tell Wetzel to send the "food box" to East. (Tr. 298).

**{¶24}** On cross-examination, the trooper testified that the first phone call from appellant's inmate number to Wetzel was placed on November 26 but the first letter sent to appellant was postmarked November 25. (Tr. 300).

**{¶25}** Trooper Bruce MacLaine is also an investigator with the Ohio State Highway Patrol. He listened to the recordings of the phone calls in question. Trooper MacLaine played the phone calls for the jury. He played nine phone calls placed from appellant's inmate and PIN numbers between November 26 and November 30, 2015. (Tr. 324-328; State Ex. 10). Those nine phone calls were all made to Wetzel's phone number. (Tr. 328). Trooper MacLaine also played the three phone calls placed from East's inmate and PIN numbers between December 3 and December 16, 2015. (Tr. 328-331; State Exs. 5, 6). Those three calls were also all made to Wetzel's phone number. (Tr. 333-334).

Case No. 17 BE 0048

{¶26} The voice in all of the calls placed from appellant's inmate number, along with the first two calls placed from East's inmate number, sound to be the same person. But the last call placed from East's inmate number was a different sounding voice. Moreover, the caller in the last call identified himself as Laron East and he stated that he was calling for his "bunkie" because his bunkie was in protective custody. (Tr. 334; State Exs. 5, 6, 10). East indicated to Wetzel that he would "take care of" something that was being sent to him. (Tr. 342).

{¶27} In the other calls, the caller talks about needing money on his books and asks Wetzel to send him money and a food box. Trooper MacLaine testified that the caller could be referring to actual money or he could be referring to Suboxone. (Tr. 337). The trooper also noted that in one of the conversations placed from East's inmate and PIN numbers, the caller referred to himself in the third person stating, "Everyone says, Rick, where's it at?" and then stating "It ain't me, it's her." (Tr. 343-344). The trooper further noted that the caller asked Wetzel if she "sent that yet." (Tr. 345). And he noted that the caller told Wetzel, he could make her some money if she sent him something and that "[w]hen you send me money, you always are going to get money back." (Tr. 345).

{¶28} In a November 27 call, the caller tells Wetzel, "No money today baby" and notes "it never takes this long." (State Ex. 10). In another call later that day, the caller asks Wetzel, "How much does our girl want?" to which Wetzel replies, "fifteen usually but if I buy a big quantity . . ." (State Ex. 10). The caller then gets angry at Wetzel for saying this and tells her, "We're not talking about drugs quit saying shit like that." (State Ex. 10). Then in a November 29 call, the caller tells Wetzel, "All I can do is wait[,]" "I never got the rest of that money[,]" "Am I gonna get the rest of that money tomorrow?" and "It don't take this long to get on there." (State Ex. 10). In another call later that day, the caller again asks, "You sure I'll get that money tomorrow?" and Wetzel replies, "yeah." (State Ex. 10). He then tells her, "I don't know why you separated the 80 and the 60, you could have 500 bucks right now. (State Ex. 10). And in a November 30 call, the caller tells Wetzel, "It don't ever take this long baby." (State Ex. 10).

{¶29} There is no question that Suboxone is a "drug of abuse" or that the Belmont Correctional Institution is a detention facility. The question here is whether the evidence,

Case No. 17 BE 0048

when viewed most favorably to the state, demonstrated that appellant knowingly conveyed, or attempted to convey, the Suboxone onto the prison grounds.

{¶30} To "convey" means "to bear from one place to another" or "to cause to pass from one place or person to another." www.merriam-webster.com. It is clear that appellant did not actually convey the Suboxone onto the prison grounds. He never had possession of it. Instead, the person who mailed the letters was the person who conveyed the Suboxone onto the prison grounds.

{¶31} Nonetheless, appellant could still be convicted of illegal conveyance if he attempted to convey the Suboxone onto the prison grounds. To "attempt" is to purposely or knowingly "engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). The evidence demonstrated that appellant was involved in a plan to transport Suboxone into the prison.

{¶32} The first count of illegal conveyance was based on the first letter containing Suboxone, which was addressed to appellant. That letter was postmarked November 25, 2015. It arrived at the prison on December 2. The testimony and call log indicated that the first phone call from appellant to Wetzel did not occur until November 26, the day after the letter was mailed. During the time after the letter was postmarked but before it arrived at the prison, appellant and Wetzel had numerous phone conversations. Construing what was said between appellant and Wetzel in the light most favorable to the prosecution as we are required to do reveals that appellant was expecting the letter from Wetzel with the Suboxone in it. He repeatedly asks her where the money is and questions whether it will arrive soon. And as the troopers testified, inmates frequently refer to drugs by code names, which include referring to drugs as "money." The conversations between appellant and Wetzel demonstrated that the two had an ongoing plan in place to transport Suboxone into the prison before Wetzel mailed the November 25 letter. The numerous phone conversations between appellant and Wetzel in which appellant makes comments such as, "it never takes this long[,]" "All I can do is wait[,]" and "Am I gonna get the rest of that money tomorrow?" constitute circumstantial evidence that appellant had planned with Wetzel to convey the Suboxone into the prison. Thus, the evidence sufficiently demonstrated that appellant was working with Wetzel to convey the Suboxone into the prison.

{¶33}   The second count of illegal conveyance was based on the second letter containing Suboxone, which was addressed to East.   That letter was postmarked December 2, 2015.   The evidence, construed in favor of the state, demonstrated that appellant and Wetzel talked on the phone numerous times and planned for Wetzel to send appellant Suboxone to sell in prison.   The evidence also demonstrated that appellant planned with Wetzel through East, his bunkie.   In a call from East to Wetzel, East told Wetzel he was calling on appellant's behalf and also told her he would take care of something that she was sending to him.

{¶34}  Though appellant's attempts to convey the Suboxone into the prison ultimately failed, the state still proved that appellant attempted to convey the Suboxone into the prison on two separate occasions.   Thus, the evidence was sufficient to support appellant's convictions.

{¶35}   In a similar case, the Fifth District upheld an illegal conveyance onto the ground of a detention facility conviction where the evidence demonstrated that the defendant wrote letters to an accomplice asking her to smuggle marijuana into the prison to him.  *State v. Garrett*, 5th Dist. No. 03-CA-49, 2004-Ohio-2231.   A visit was arranged by the defendant.   The accomplice was stopped on her way into the facility and was found to be attempting to smuggle marijuana into the institution.   The marijuana never made it to the defendant.   Nonetheless, the Fifth District found sufficient evidence to uphold the conviction.   Thus, the drugs need not actually reach the defendant in order for an illegal conveyance conviction to be upheld.

{¶36}   Accordingly, appellant's sole assignment of error is without merit and is overruled.

{¶37}   For the reasons stated above, the trial court's judgment is hereby affirmed.

Robb, J., concurs.

D'Apolito, J., concurs.

Case No. 17 BE 0048

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**